IRVING D. ROSSHEIM, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 57503. Promulgated December 13, 1934.

*Lawrence A. Baker, Esq.*, for the petitioner.
*Paul E. Waring, Esq.*, for the respondent.

OPINION.

McMahon: In this proceeding the respondent based his original deficiency upon a determination that petitioner received additional compensation in 1928 in the amount of $186,212.50, being the difference between the fair market value of certain stock and the cost thereof to petitioner. By an amended answer respondent has increased the amount of additional compensation so received to $243,800, and asks the Board to increase the deficiency accordingly. Respondent relies upon articles 51 and 53 of Regulations 74,[1] Treasury Decision 3435, C. B. II-7, p. 50, and our decision in *Albert R. Erskine*, 26 B. T. A. 147.

The respondent contends that the provisions of article 51[1] of Regulations 74 require that the difference between cost and fair market value of the stock purchased by petitioner, under the facts

[1] Art 51. * * * Where property is sold by a corporation to a shareholder, or by an employer to an employee, for an amount substantially less than its fair market value, such shareholder of the corporation or such employee shall include in gross income the difference between the amount paid for the property and the amount of its fair market value. In computing the gain or loss from the subsequent sale of such property its cost shall be deemed to be its fair market value at the date of acquisition by the shareholder

and circumstances disclosed in the instant proceeding, should be included in gross income. Article 51 is the successor to, and is identical with, article 31 of Regulations 65 and 69, interpreting corresponding provisions of the 1924 and 1926 Acts, respectively. It should also be noted that article 31 of Regulations 65 and 69 and article 51 of Regulations 74 were first promulgated by the Treasury Department as Treasury Decision 3435, and thereafter appeared as a part of Regulations 65, 69, and 74.

Treasury Decision 3435 has been carefully considered by the courts in *Taplin* v. *Commissioner*, 41 Fed. (2d) 454; and *Commissioner* v. *Van Vorst*, 59 Fed. (2d) 677, affirming *George W. Van Vorst, Executor*, 22 B. T. A. 632, and by the Board in the latter case and in *James William Everhart*, 26 B. T. A. 318. These cases and authorities therein cited adequately support the view that article 51 of Regulations 74 cannot create income where none, in fact, exists when measured by the statutory definition of gross income. We cannot agree with the contention of the respondent based on article 51.

The respondent further contends that the resolutions of September 12 and 26, 1928, which are set forth in the agreement of October 15, 1928, constitute a contract of employment between petitioner and the Stanley Co. of America, and that the difference between cost and fair market value was additional compensation. Petitioner contends that these resolutions permitted him to buy stock at a bargain price, and that no contract of employment was intended or resulted.

The petitioner testified that he thought he was being offered an opportunity to become a substantial stockholder, since he owned very little stock in the corporation.

Except for the inference which may be drawn from all the facts disclosed in this proceeding, the record throws no light upon the influences which moved the directors to grant this option to the petitioner.

Between 1915 and 1918 the petitioner was employed as a law clerk by the firm of Stern & Wolf. His duties with that firm, however, had to do particularly with a group of corporate clients then engaged in the extension of motion pictures, which group in 1919 was combined and consolidated into the Stanley Co. of America. In the latter part of 1919 he was taken over by that company because his time was devoted almost entirely to its business. In December 1925 the petitioner became assistant treasurer of the company, with a

---

or the employee. This paragraph does not apply, however, to the issuance by a corporation to its shareholders of the right to subscribe to its stock, as to which see article 58.

ART. 53. * * * Where services are paid for with something other than money, the fair market value of the thing taken in payment is the amount to be included as income. * * * Compensation paid an employee of a corporation in its stock is to be treated as if the corporation sold the stock for its market value and paid the employee in cash. * * *

salary of $25,000 per annum, commencing January 1, 1926. In April 1927 his salary was increased to $800 per week, and in July 1927 he was made treasurer of the company at the same salary. In January 1928, because of dissatisfaction of members of the board of directors of the company with McGuirk, the then president of the company, on account of his method of attempting to do business without consulting them, the petitioner was elected president of the company. He was chosen as a compromise candidate by the opposing factions. His salary was $65,000 per annum plus $10,000 for expenses, which was the same salary theretofore paid to McGuirk. In May 1928 the option as expressed in the resolution of September 28, 1928, was first discussed by the petitioner with some of the directors and largest stockholders of the company. As a result of this discussion the petitioner understood that he would be granted such option. In July 1928, at the first meeting of the newly elected board of directors, the petitioner was reelected president. Thus it appears that petitioner was, after 1915, actively interested in the business of the Stanley Co. and its predecessor companies.

The business of the Stanley Co. was conducted in a very informal manner and from December 1926 until January 1928 the business of the company was conducted with even less formality than before. It never made any salary contracts with any of its employees or officers. In fact the option which the petitioner understood he was to be given was not reduced to writing until the petitioner, in view of the contemplated absorption of Stanley Co. by Warner Brothers Pictures, Inc., urged that this be done in order to protect his own interests.

It also appears that the Stanley Co. did not make it a practice to pay its employees or any of its officers a bonus, but treated authorized salaries as compensation in full.

Whatever the practice of the company may have been in the conduct of its business, it does appear that the petitioner was not only able to induce the directors to grant him an option giving him the right to purchase stock of the company at $40 when the bid price for such stock for not less than 1,000 shares would be not less than $55 a share, but also was able to have the agreement put in writing. In fact the agreement was reduced to writing at a time when the price of $55 had already been bid and paid for more than 1,000 shares while the petitioner could purchase at $40.

The right that Rossheim acquired under the written agreement was a right to purchase up to 10,000 shares of stock at $40 per share. The right expired in any event after December 31, 1929, and no provision was made for purchases of a portion of the stock in subsequent years. Cf. *Phillip W. Haberman*, 31 B. T. A. 75. Actu-

ally petitioner acquired the right, exercised it, and purchased the stock, all during the taxable year 1928, so that the question of the value of the *right* need not be considered.

In reference to petitioner's relationship with the corporation, there is found a proviso that if petitioner "resigns as president of Stanley Company of America before the exercise of this option the option thereupon shall become null and void." In fact, unless his continued services with the Stanley Co. be deemed the consideration for such option, such option upon its face appears to have been given without consideration whatever. It is a well-established rule that an option contract, to buy or sell, as in the case of other contracts, must be supported by a valuable consideration, 55 C. J. 109, and cases cited. As stated in *Albert Russel Erskine*, 26 B. T. A. 147, 157:

> * * * The officers and directors of the corporation had no lawful right to make a gift to the petitioner of any part of the value of the shares of stock, or to "sell" them to the petitioner at a price known to be considerably less than their cost or market value. We must assume that the officers and directors did not act unlawfully. *Noel* v. *Parrott*, 15 Fed. (2d) 669.

So we must assume here that the directors and officers did not act unlawfully. Here the consideration moving from petitioner to the corporation was services. It seems to us that the members of the board of directors and stockholders considered the petitioner a valuable employee and were anxious to retain his services, especially at a time when friction arose among them. This is obvious from the fact that he was chosen as president in January 1928 by the opposing factions. Furthermore, the petitioner had been actively engaged in the business of the company for many years.

Taxation is a practical matter and we must look to the substance rather than the form. Business men acting as directors and officers of corporations ordinarily do not give away the funds in corporate treasuries without adequate consideration. We are well satisfied that the petitioner would not have been given the option in question if he were not president of the corporation, under all the facts and circumstances as shown by the proof. The mere fact that the provisions of the option were not woven into a formal contract of employment is not sufficient to establish that the contention of the respondent in this respect is unsound. In our view this proceeding is controlled by the underlying principles of *Albert Russel Erskine*, *supra*, and *Omaha National Bank et al., Executors*, 29 B. T. A. 817, notwithstanding that there are some differences in the facts and circumstances and more particularly that there were more formal contracts in those cases. We are impressed by the failure of the petitioner to show that the difference between the cost to him and market value of the stock was not taken as a deduction by the Stan-

ley Co. in 1928. Cf. *Haskell & Barker Car Co.*, 9 B. T. A. 1087, and *Commercial Investment Trust Corporation*, 28 B. T. A. 143.

No question of a gift of the difference between the cost and fair market value is involved here, such as was considered in *Harry F. Robertson*, 5 B. T. A. 748, and *Joseph W. Robinson*, 21 B. T. A. 907, reversed in *Robinson* v. *Commissioner*, 59 Fed. (2d) 1008.

Reviewed by the Board.

*Decision will be entered for the respondent.*

MURDOCK, SEAWELL, GOODRICH, and LEECH concur in the result.

BLACK dissents.

---

SMITH, dissenting: I can not agree that the petitioner received taxable income for 1928 in the amount of $243,800 by exercising an option to purchase 10,000 shares of the unissued capital stock of Stanley Co. of America. According to the findings, the petitioner discussed with some of the directors and largest stockholders of the Stanley Co. the granting of this option in May 1928. During that month the stock sold as high as $45 per share and as low as $30.50 The petitioner was not to exercise the option until the stock sold on the open market in an amount of not less than 1,000 shares at $55 The petitioner understood that the option would be granted him This informal understanding was carried into effect at a meeting of the board of directors on September 26, 1928. It appears that by that time 1,000 shares of the stock had sold at a price of $55 Even if the contract made by the board of directors with the petitioner on September 26, 1928, was a contract for compensation for services performed or to be performed, it seems to me that the only amount which could be included in the gross income of petitioner for 1928 was the value of the option contract at the date it was acquired by the petitioner. The findings do not show any cash value for the contract at that date. By the option contract the petitioner was not given shares of stock in payment for his services.

Prior to the end of 1928 the stock advanced in price by leaps and bounds. In December 1928 the petitioner exercised his option and acquired the shares of stock. These shares of stock cost him something. It seems to me that when he sold them the basis for the computation of gain or loss was the price that he paid for them and not the fair market value on the date when he exercised the option.

I can not see that the principle applied by the Board in *Albert Russel Erskine*, 26 B. T. A. 147, is applicable here. To my mind that case is clearly distinguishable from the present one. The facts in this case are substantially those which obtained in *D. C. Bothwell*, 27 B. T. A. 1351, in which we held that where the optionee sold his

stock the basis for computing his gain was the purchase price for the shares. I am also of the opinion that the Board's decision in this case is contrary to *Rose* v. *Trust Co. of Georgia*, 28 Fed. (2d) 767; *Taplin* v. *Commissioner*, 41 Fed. (2d) 454; *Durkee* v. *Welch*, 49 Fed. (2d) 339; and *Commissioner* v. *Van Vorst*, 59 Fed. (2d) 677.