*875 OPINION.
TuRNee:
The first issue for determination is the right of the petitioner to amortize the commissions paid in connection with the sale of its preferred stock by deducting one twentieth of such costs for each year of its corporate existence. It now contends that the commissions so paid amounted to $195,000, $45,000 representing a cash payment and the remainder the 500 shares of common stock at á value of $300 per share.
It is well settled that commissions paid in connection with the issue and sale by a corporation of its stock are not deductible as ordinary and necessary business expenses for the year paid or incurred. Corning Glass Works, 9 B. T. A. 771; affd., 37 Fed. (2d) 798; certiorari denied, 281 U. S. 742; Simmons Co., 8 B. T. A. 631; affd., 33 Fed. (2d) 75; certiorari denied, 280 U. S. 577; Emerson Electric Manufacturing Co., 3 B. T. A. 932; Odorono Co., 26 B. T. A. 1355. In Simmons Co., supra, the Circuit Court of Appeals said:
Commissions paid for marketing stock simply diminish the net return from the stock issue. Financially they are equivalent to an issue of stock at a discount from par; the par value must be carried as a liability without an offsetting, equal, amount of cash or property.
In Corning Glass Works, supra, it is said that the payment of such commissions “ represents a capital expenditure, and should be charged against the proceeds of the stock, and not be recouped out of operating earnings.” These pronouncements, in our opinion, rather than the reasoning of the court in Hershey Manufacturing Co. v. Commissioner, 43 Fed. (2d) 298, relied on by the petitioner. *876 give tlie correct answer to the question here involved. We have previously considered the question and held that a corporation may not amortize or deduct commissions so paid ratably over the life of the stock. Commercial Investment Trust Corporation, 28 B. T. A. 148; Surety Finance Co. of Tacoma, 27 B. T. A. 616. On the basis of these latter decisions, which are directly in point, the first issue is decided for the respondent. See also James I. Van Keuren, 28 B. T. A. 480.
On the second issue the petitioner contends that it discovered the Alamo Mine, within the meaning of the statute, section 204 (c) (1) of the Revenue Act of 1926,[1] and under its provisions is entitled to compute the depletion thereof on the basis of a discovery value. The date of discovery of the Alamo Mine fixed by the petitioner is December 31, 1924, when the vein of coal had been opened up and developed to such extent that all of its characteristics and the mining conditions became known. In other words, the petitioner contends that while Lewis discovered the seams of coal which lay under section 36, the petitioner, by virtue of its development work and operations along the seams, discovered the mine and that the discovery was not complete until December 31, 1924, at which time the seam had been sufficiently explored and opened up to determine its size and extent.
. In support of this contention, the petitioner points out that Webster’s New International Dictionary defines a mine as “ a subterranean cavity or passage ” from which coal, ores, etc., “ are taken by digging.” From this it is concluded that the discovery of a vein or deposit of coal is not, the discovery of a mine, since at that time there is no underground cavity or passage. In further support of its position in this respect, the petitioner cites numerous cases to show that the term “ mine ” means a mineral deposit which has been opened up and which is being worked. In a quotation from one of these cases, Astry v. Ballard, 2 Mod. 193 (8 Morrison Mining Report *877 316), decided in England some 250 years ago, it is interesting, to note that the court, after stating that a mine is not properly so-called until it is opened, refers specifically to-opened and unopened mines; The same is true of the quotation from Westmoreland Co.'s Appeal, 85 Pa. State, 344, 346. We do not believe that any of the cases cited on petitioner’s behalf are authority'for construing the term “mine ”, as used in the statute, in the restricted sense contended for. • .Neither do we believe that Congress had in mind any such interpretation when the statute was enacted. We are convinced that the discovery of the mine, as contemplated by the statute, refers not to the finding of a mine in the sense of a complete operating unit, but the ascertainment of a natural deposit of coal or mineral previously unknown. We seriously doubt whether there could be a date of discovery of a mine in the sense contended for by the petitioner. The gradual development of a coal seam or mineral deposit results in constant enlargement of the field of activity of the mine until the deposit is exhausted, and it is not .until the deposit is exhausted that any one can positively and definitely determine the exact amount and quality of the coal or mineral that can profitably be removed and all of the working conditions to be encountered in connection with its extraction. An arbitrary date would have to be fixed at some time in its operations, just as the petitioner has done here. The petitioner recognizes this weakness in its position and in its brief states that it “ would be impossible to point to a particular day as the date of discovery, or to fix a day when it could be said mth oertamty that the development had proceeded to such an extent that the vein was no longer merely a vein but was a mine.” The foregoing quotation graphically depicts the uncertainty which attaches to efforts to determine a discovery date under the petitioner’s- interpretation of the term “ mine.”
In our opinion the facts clearly indicate that the discovery of the Alamo Mine was made prior to the acquisition of the property by the petitioner on October 16,1922. Lewis acquired the lease in 1921, and immediately started the work of exploration. He employed Muiry, a churn driller with years of experience in that territory, to sink eight drill holes. The results are shown in the findings of fact.' Testimony was offered, both on behalf of the petitioner and on behalf of the respondent, by experienced coal men who were familiar with the territory in which the petitioner’s mine is located and familiar with the results of the drilling tests. The testimony of these men convinces us that these drill tests disclosed deposits of good and mineable coal. The chippings from the drill holes - were carefully examined and analyzed and the results were considered sufficient, by all parties testifying, to justify the development of the mine. Some of the witnesses were more positive than others in their conclusions *878 as to the extent and quality of the coal indicated by the tests, but those who were most reluctant to state that a workable vein of coal had been discovered were of the opinion that the results justified the opening of the mine. Lewis indicated that he was satisfied on the point in his communication to the lessor company, stating that he intended to exercise his option and to carry out the terms of the lease. The same views were disclosed in his communication to the board of directors of the petitioner company. The directors of the petitioner company, according to the minutes of their organization meeting, were convinced that a vein of commercially mineable coal had been discovered and immediately took the necessary steps for installing and erecting the machinery and equipment required for an extensive coal-mining operation. They based their conclusions not only on the results of the drill holes sunk on section 36, but on tests made by the Victor American Fuel Co. on section 25, immediately to the north of section 36.
We accordingly conclude that the Alamo Mine was discovered within the meaning1 of the statute prior to the petitioner’s acquisition of the lease and that the petitioner is not entitled to compute depletion on the basis of a discovery value. Darby-Lynde Co., 20 B. T. A. 522; affd., 51 Fed. (2d) 32; Hoffer Oil Corporation, 27 B. T. A. 98; Rialto Mining Corporation, 25 B. T. A. 980; Melville G. Thompson, 10 B. T. A. 25; Boucher-Cortright Coal Co., 7 B. T. A. 1.
In the petition there is a claim in the alternative to the effect that depletion should be computed on the basis of the value of the lease on section 36 at the time of its acquisition by the petitioner from Lewis. This alternative contention was not discussed at the hearing, nor is there any supporting argument to be found in the brief, but in any event the contention is disposed of by the provisions of sections 204 (a) (8) and 203 (b) (4) of the Revenue Act of 1926, which, when applied to the facts in this case, provide that the basis for depletion of the lease so acquired by the petitioner is the same in its hands as in the hands of Lewis, from whom it was acquired. The record does not indicate that Lewis paid anything for the lease, and the method used by the respondent of computing depletion on the basis of development expense will not be disturbed. The facts do show, however, that development expense on December 31 of each of the years herein involved is greater than that used by the respondent in his determination of the deficiencies. There is also a variation in the number of tons of coal mined in the taxable years. The depletion deductions should be revised on the basis of the figures shown in our findings of fact.

Decision mil be entered under Rule 50.

 Sec. 204 (c) The basis upon which depletion, exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the same as is provided in subdivision (a) or (b) for the purpose of determining the gain or loss upon the sale or other disposition of such property, except that—
(1) In the case of mines discovered by the taxpayer after February 28, 1913, the basis for depletion shall be the fair market value of the property at the date of discovery or within thirty days thereafter, if such mines were not acquired as the result of purchase of a proven tract or lease, and if the fair market value of the property is materially disproportionate to the cost. The depletion allowance based on discovery value provided in this paragraph shall not exceed 50 per centum of the net inoome of the taxpayer (computed without allowance for depletion) from the property upon which the discovery was made, except that in no case shall the depletion allowance be less than it would be if computed without reference to discovery value. Discoveries shall include minerals in commercial quantities contained within a vein or deposit discovered in an existing mine or mining tract by the taxpayer after February 28, 1913, if the vein or deposit thus discovered was not merely the uninterrupted extension of a continuing commercial vein or deposit already known to exist, and if the discovered minerals are of sufficient value and quantity that they could be separately mined and marketed at a profit.