### PATENT BUTTON CO. v. COMMISSIONER OF INTERNAL REVENUE.

No. 159, Docket 22510.

United States Court of Appeals Second Circuit.

Argued March 10, 1953.

Decided April 7, 1953.

Truman Henson, New York City (Edward J. Mooney, New York City, on the brief), for petitioner.

Louise Foster, Sp. Asst. to Atty. Gen. (H. Brian Holland, Asst. Atty. Gen., and Ellis N. Slack, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Before AUGUSTUS N. HAND, CHASE, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

The Commissioner of Internal Revenue has assessed a deficiency in the excess profits tax for 1942 of taxpayer, The Patent Button Company, which now petitions for review. The sole question involves a cash payment of $80,339.56 made by petitioner in 1942 to its General Manager, Leonard R. Carley. Petitioner claimed that this was deductible, as being compensation to Carley; but respondent held it to be payment for stock transferred to petitioner and therefore disallowed the deduction. The Tax Court in a careful decision analyzing the facts in some detail sustained the respondent and this petition followed. The controlling provisions defining the deductibility of compensation for personal services are I.R.C. § 23(a) (1) (A) and Treas.Reg. 111, § 29.23(a)–6.

Petitioner, a Connecticut manufacturing corporation, incorporated in 1876 and located in Waterbury, has always been owned exclusively by the members of not more than three families except for the stock transferred to Carley as hereinafter set forth. Carley was first employed by petitioner in 1922, after which the taxpayer's net worth increased by about half a million dollars by 1930. He then resigned, leading to various negotiations for recognition of his value to the company and certain preliminary agreements for his future service, all of which terminated in a detailed written agreement between petitioner and Carley executed on January 5, 1932, and retroactively effective January 1, 1931. This agreement is too long to set forth in detail, but may be summarized so far as important. Its basic provision was that Carley was to be employed as petitioner's Vice President and General Manager at a salary of $15,000 per year, plus a commission of 2 per cent of the annual net profits before taxes. As an inducement to Carley, petitioner also sold and assigned him 10 per cent of its entire outstanding capital stock for the sum of $133,906.65. The purchase price was not to bear interest and could be paid at any time by Carley at his option. But he agreed to pay on account of the purchase price one-third of all dividends declared and paid upon this stock and also the entire amount of the 2 per cent commission noted above. A further provision permitted cancellation of the agreement by either party on six months' notice. Still another authorized repurchase of the stock, including any stock dividends thereon, at its original purchase price, plus or minus any increase or decrease in its book value and minus the amount of any of the original purchase price then unpaid; but such repurchase price was not to be less than the original purchase price minus the amount of any payments that might have been made thereon. The amount fixed by the agreement for the sale price was 80 per cent of the book value of the stock as of December 31, 1930.

The agreement remained in effect until 1942, during which time Carley's commissions and dividends were applied to his purchase as agreed, although he himself made no additional payments. As contingent credits were made against the purchase price, petitioner delivered certificates to Carley for the stock thus covered, retaining endorsed certificates for the balance of the shares. Certificates for 392

shares were so delivered to him up to the end of 1941; those for another 232 shares were issued to him in 1942. All of the certificates retained by petitioner bore upon them a restrictive legend, as required by the contract, that they were subject to "the options, covenants and agreements" contained in this contract. Of the 624 shares issued to Carley, 528 did not bear the restrictive legend. No stock transfer stamps were affixed to any of the certificates issued by petitioner in the name of Carley. The first two certificates issued bore the notations, "No stamps due on this" and "No stamps" respectively. No stock transfer stamps were affixed to the 1931 tentative agreement or to the 1932 contract.

Carley was one of petitioner's directors at all times when such certificates were issued and delivered. He also attended meetings of petitioner's stockholders and voted the 1,920 shares of stock standing in his name. No one else voted these shares during the period. On its tax returns during this period petitioner made no deduction as expenses of the dividends paid Carley, but did deduct the commissions.

In May, 1942, Carley warned the petitioner that he would resign unless a new arrangement could be agreed upon because the existing arrangement was adversely affecting his financial situation. His lawyer had advised him that under the changes in the tax law, operation under the contract was practically prohibitive to him, since he was taxable on the commissions and dividends, and yet received no cash to pay the tax. He did resign soon thereafter, exercising his option to require the company to repurchase his stock. This it did, reaching a computation of the amount due, in the sum stated above, $80,339.56, according to the method set out in the contract, involving a deduction of the amounts unpaid by Carley from the original purchase price. On July 14, 1942, Carley executed a release and endorsed the stock certificates, which his attorney delivered to petitioner. No stock transfer stamps were affixed to any stock certificates or to the release. The directors passed approving resolutions on July 14, 1942, and the stockholders on December 15, 1942. Petitioner

then filed returns for 1942 claiming the deduction in question and stating that the purpose of the contract of January 5, 1932, was only to provide for payment of compensation to Carley. On January 7, 1943, Carley's attorney wrote petitioner's president, stating that Carley would dispute any claim by petitioner that this contract had not been intended to provide for a bona fide purchase-sale transaction. This was followed by Carley's later letter to the same import of February 16, 1943, together with a letter of the same date to the Commissioner of Internal Revenue taking exception to petitioner's statement on a return which characterized the payment as compensation. On March 1, 1943, he followed up these steps by resigning as a director and officer and sending a letter to petitioner wherein he gave formal notice of cancellation of his existing contract of employment. His resignation was accepted on March 9, 1943. On April 13, 1943, he died.

Petitioner claims that a question of law is involved which should be reviewed by us notwithstanding the Tax Court's findings that the 1942 payment was a repayment of the purchase price of the shares, rather than extra compensation to Carley. Except as a construction of the contract executed in 1932, we do not see how the issue is to be treated as a question of law; rather it is a question of fact, depending on the intent, purposes, and acts of the parties when the payment was made. So far as the construction of the original agreement is concerned, however, we fail to see how that can help the petitioner. On the contrary, and except for the admitted fact that the entire arrangement was an inducement to give Carley a greater share in the business he had made prosperous, the whole trend of the agreement is otherwise. For it speaks throughout in terms of sale and assignment of the stock to Carley and of an option to reconvey by Carley or repurchase by the petitioner in the event of ultimate termination of the employment. There is no reason in law why such a transaction, considered as an inducement or otherwise, must necessarily be compensation and cannot be what it

purports to be: an outright transfer of the stock, with an option for its retransfer later. See Gardner-Denver Co. v. C. I. R., 7 Cir., 75 F.2d 38, certiorari denied 295 U.S. 763, 55 S.Ct. 922, 79 L.Ed. 1705; Commercial Inv. Trust Corp. v. C. I. R., 28 B.T.A. 143, 151, affirmed Commercial Inv. Trust Corp. v. Helvering, 2 Cir., 74 F.2d 1015.

When we turn to the evidence of the later dealings between the parties upon which the Tax Court relied, we think its findings amply sustained by the evidence. Indeed, except for a single circumstance the evidence appears to us to be all one way until the time when the petitioner first made its claim in 1943 seeking the obvious tax advantage involved. Carley, in his participation in the affairs of the business and at the meetings, acted as a stockholder throughout and was apparently accepted as such by every one. The various bookkeeping transactions reflecting the dividends and commissions paid him and their application to the stock certificates are in accord; or at least they suggest nothing to the contrary. The sole conflicting circumstance is the failure to affix stock transfer stamps either on the original transfers to Carley or upon the retransfer to petitioner. Obviously these were matters to be considered as bearing on the intent of the parties. But naturally various other explanations are possible, and the one relied upon by petitioner is surely not exclusive. In the light of the compelling evidence otherwise, we think the Tax Court was not required by this one factor to reach a contrary finding. We therefore discover no error in its decisive finding that Carley became a bona fide stockholder of petitioner in 1932 and that its 1942 payment to him therefore constituted the sale price of the stock which he resold to it and was not compensation for his services. Cases cited supra.

Petitioner also claims to find an error of law in the opinion of the Tax Court, commencing: "To the growing list of adversary tax situations where two taxpayers are the true contestants and respondent is in effect no more than a stakeholder this proceeding must be added," and going on to recite the natural difference of opinion between petitioner and its employee as to this issue. Of course, as petitioner urges, decision of Carley's claim to treat this payment as a capital gain from stock transfer, rather than compensation, is not binding or decisive upon petitioner's claim. We do not observe, however, that the Tax Court has so treated it. Naturally Carley's view of the transactions as developed in the record was evidence within the proper cognition of the court. Petitioner, it seems to us, has read too much into this little flourish of the opinion writer. It was designed to give a quick key to the nature of the question involved, rather than to set forth a principle of law. The record does not disclose any harm to the petitioner from the observation.

The decision of the Tax Court is affirmed.